Case Nos. 25-4673, 25-4674

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————◆———————

**UNITED STATES OF AMERICA**,
Plaintiff-Appellant

v.

**LETITIA JAMES**,
Defendant-Appellee

———————◆———————

**UNITED STATES OF AMERICA**,
Plaintiff-Appellant

v.

**JAMES BRIEN COMEY, JR.**,
Defendant-Appellee

———————◆———————

On Appeal from the
United States District Court for the
Eastern District of Virginia

———————◆———————

**BRIEF OF AMICUS CURIAE
UNIFY.US
IN SUPPORT OF THE UNITED STATES
SEEKING REVERSAL**

————————————————————————

THEODORE COOPERSTEIN PLLC
Theodore M. Cooperstein
1888 Main Street
Suite C-203
Madison, MS 39110
Telephone: (601) 397-2471
ted@appealslawyer.us
**Counsel for Amicus Curiae**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. ___25-4763, 2___     Caption: ___United States v. Letitia James and United States v. James Brien Comey,___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Unify.US___
(name of party/amicus)

_____

who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?   ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                     ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?                     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Theodore M. Cooperstein__          Date: ____2/11/2026____

Counsel for: __Amicus Curiae Unify.US__

- 2 -

[Print to PDF for Filing]     [Reset Form]

# TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICUS CURIAE ……….….…………………….1

SUMMARY OF ARGUMENT…..…….……………………………....… 2

ARGUMENT ……………….…………………………………….4

I.   THE CONSTITUTION REQUIRES EXECUTIVE CONTROL OF
     PROSECUTION ……………………………………………... 4

     A.   The Vesting Clause Commits Prosecution Exclusively to the
          Executive Branch ……………………………………….4

     B.   The District Court's Reading Creates an Accountability
          Vacuum………………………………………………….6

     C.   Post-*Morrison* Jurisprudence Reinforces Executive Control……..7

     D.   The Removal Power Problem…………………………………..8

II.  THE ORIGINAL MEANING OF THE EXCEPTING CLAUSE
     RAISES SERIOUS CONSTITUTIONAL DOUBT ………………..…. 9

     A.   The Founding-Era Understanding…………………………………9

     B.   Historical Practice Confirms Executive Appointment of
          Prosecutors…………………………………………….. 11

     C.   These Concerns Create Constitutional Doubt……………………. 12

III. THE CONSTITUTIONAL AVOIDANCE RULE REQUIRES THE
     GOVERNMENT'S READING ……………………………………. 12

     A.   The Avoidance Rule Applies…………………………………….13

     B.   The Government's Reading Avoids Constitutional Difficulties…14

CONCLUSION ………………………………………………………. 15

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bordenkircher v. Hayes,*
434 U.S. 357 (1978)……………………………………………………….5

*Collins v. Yellen,*
594 U.S. 220 (2021) ……………………………………………………….8

*Ex parte Hennen,*
38 U.S. (13 Pet.) 230 (1839) ……………………………….…….……… 10

*Free Enterprise Fund v. PCAOB,*
561 U.S. 477 (2010) …………………………………………….……… 7

*Freytag v. Commissioner,*
501 U.S. 868 (1991) …………………………………………… 5, 11

*Harris v. United States,*
536 U.S. 545 (2002) ………………………………………………… 13

*Heckler v. Chaney,*
470 U.S. 821 (1985) ………………………………………………… 5

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) ………………………………………….……… 13

*Morrison v. Olson,*
487 U.S. 654 (1988) ……………………………….……………… 4, 7, 8

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) …………………………………………….…..7-8

*Solid Waste Agency v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) …………………………………………..…… 14

*The Pocket Veto Case*,
279 U.S. 655 (1929) ……………………………………………….. 12

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ……………………………………………… 9

*Trump v. United States*,
603 U.S. 593 (2024) ……………………………………………….. 5

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 …………………………………….. 4

U.S. Const. art. II, § 2, cl. 2 …………………………………….. 9

U.S. Const. art. III …………………………………………….. 2, 5, 14

**Statutes**

28 U.S.C. § 541 ……………………………………………….. 8

28 U.S.C. § 546 ………………………………….1,2, 3, 4, 5, 12, 14, 15

Judiciary Act of 1789, ch. 20, 1 Stat. 73 ………………………….10, 11

Act of Mar. 3, 1863, ch. 93, §2, 12 Stat. 768 …………………….. 11

**Other Authorities**

The Federalist No. 70 (Alexander Hamilton) ……………………….6-7

2 Records of the Federal Convention of 1787 (Farrand ed., 1911) ……. 10

Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts (2012)……………..…13

## INTEREST OF THE AMICUS CURIAE[1]

Unify.US is a 501c4 organization that unites faith-based and economic grassroots conservatives to pursue policy solutions centered on the principles of individual freedom, limited government, free enterprise, and traditional American values. Unify.US promotes shared belief that free people, free markets, prosperity, and peace are first principles for American greatness. Unify.US restores trust in America's institutions through proper balance of power in the three branches of our national government and better understanding and respect for our federal structure.

Amicus submits this brief to address the constitutional dimensions of the statutory question presented. The government's opening brief comprehensively addresses the text and history of 28 U.S.C. § 546. Amicus writes to develop more fully the separation-of-powers concerns that the government raises but, understandably given space constraints, does not elaborate. These constitutional principles independently support reversal and, at minimum, inform the proper

---

[1] All parties have consented to filing this brief. This brief was not authored in whole or in part by counsel for any party, and no person or entity other than amicus or its counsel has made monetary contributions to its preparation and submission.

interpretation of the statute under the constitutional avoidance rule. When coordinate branches of the federal government stray from their enumerated roles and arrogate to themselves the responsibilities and authorities of a separate branch, the delicate structure and balance of the federal government weakens and decays. As a result, individuals can no longer trust the government to act under rule of law nor the federal officers to comport themselves with accountability to the people.

## SUMMARY OF ARGUMENT

The district court's interpretation of Section 546 raises serious constitutional concerns that independently support reversal.

First, the Constitution vests all executive power in the President and requires that he maintain control over the prosecution of federal crimes. The district court's reading permanently divests the Executive Branch of authority to select interim U.S. Attorneys once 120 days elapse, transferring that power to Article III judges who are constitutionally insulated from political accountability. This creates an unprecedented accountability vacuum: a federal prosecutor selected by no elected official, supervised by no politically accountable superior, and removable only through an appointment-removal standoff between the

courts and the President. The Framers designed the Executive Branch to prevent precisely this diffusion of responsibility.

Second, the original meaning of the Appointments Clause's Excepting Clause raises serious doubt whether Congress may vest appointment of prosecutors in the courts at all. The phrase "Courts of Law" was understood at the Founding to authorize judicial appointment of officers ancillary to the judicial function, such as clerks and commissioners. Prosecutors exercise core executive power and were appointed exclusively by the President for the first seventy-five years of the Republic. The first statutory authorization for judicial appointment of interim U.S. Attorneys came only in 1863, during the Civil War, and was understood as an emergency measure. Whether or not Section 546(d) is ultimately constitutional, these concerns create the kind of serious constitutional doubt that triggers the avoidance rule.

Third, because Section 546 admits of more than one reasonable reading, the constitutional avoidance rule requires adopting the interpretation that preserves constitutional harmony. The government's reading, which treats Sections 546(a) and 546(d) as conferring parallel appointment authority, avoids the constitutional difficulties identified

above. The district court's reading, which treats Section 546(d) as permanently displacing executive appointment authority, invites them. This Court should adopt the former.

## ARGUMENT

### I. THE CONSTITUTION'S STRUCTURE REQUIRES EXECUTIVE CONTROL OF PROSECUTION, AND SECTION 546 CANNOT BE READ TO PERMANENTLY DISPLACE THAT AUTHORITY.

### A. The Vesting Clause Commits Prosecution Exclusively to the Executive Branch.

The Constitution's first substantive grant of federal authority provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Unlike Article I's grant to Congress of only those "legislative Powers **herein granted**," Article II's vesting is plenary and unqualified. This textual difference was no accident. As Justice Scalia explained in his influential *Morrison v. Olson* dissent, the Framers understood that executive power, particularly the power to enforce the laws through prosecution, must be concentrated in a single, accountable officer to preserve both liberty and effective government. 487 U.S. 654, 705 (1988) (Scalia, J., dissenting).

Prosecution of crimes is among the core executive functions. It involves the discretionary enforcement of laws: determining which violations warrant government resources, which defendants merit leniency, and which cases serve the public interest. Decisions about "whether to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). This discretion is "a special province of the Executive Branch." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). "Investigation and prosecution of crimes is a quintessentially executive function." *Trump v. United States*, 603 U.S. 593, 620 (2024).

The district court's interpretation of Section 546 disrupts this constitutional architecture. Under its reading, once 120 days elapse from the Attorney General's initial interim appointment, the Executive Branch permanently loses authority to select the chief federal prosecutor for that district. The appointment power shifts irrevocably to Article III judges — unelected, life-tenured, and constitutionally insulated from political accountability — where it remains until the Senate acts on a presidential nominee.

5

## B. The District Court's Reading Creates an Accountability Vacuum.

The constitutional problems with the district court's interpretation extend beyond formalist concerns about which branch holds appointment authority. They implicate the Framers' carefully constructed system of accountability for the exercise of governmental power.

Consider the practical consequences of the district court's interpretation. A court-appointed interim U.S. Attorney: (1) Is not selected by any elected official (neither the President nor the Senate plays any role); (2) Is not subject to meaningful oversight by the Attorney General, who has no appointment leverage; and (3) Serves indefinitely until Senate confirmation of a presidential nominee, which the Senate may delay at will. The result is a prosecutor answerable to no one.

The Framers vested executive power in a single President precisely to ensure accountability. As Hamilton explained in Federalist No. 70, "one of the weightiest objections to a plurality in the Executive ... is that it tends to conceal faults and destroy responsibility." The Federalist No. 70, at 426 (Alexander Hamilton)

(Clinton Rossiter ed., 2003). The President "will be subjected to "removal from office" or "actual punishment" by the people and their representatives if executive power is abused. *Id*. at 427. This accountability mechanism fails entirely when prosecutors are appointed by judges and answerable to no politically accountable official.

## C. Post-*Morrison* Jurisprudence Reinforces Executive Control.

The Supreme Court's Article II jurisprudence has evolved significantly since *Morrison v. Olson,* 487 U.S. 654 (1988), upheld the independent counsel statute. While *Morrison* has not been formally overruled, its reasoning has been substantially undermined by subsequent decisions emphasizing the unitary executive.

In *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010), the Court invalidated a dual for-cause removal restriction, emphasizing that "the Constitution requires that a President must be able to hold his subordinates accountable for their conduct" and that "'[t]he buck stops with the President.'" *Id.* at 493-94. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Court struck down another removal restriction, explaining that the entire 'executive Power' belongs to the President

alone and that Article II "makes the President the most democratic and politically accountable official in Government." *Id.* at 224.

In *Collins v. Yellen*, 594 U.S. 220 (2021), the Court reaffirmed that presidential control over executive officers is a constitutional imperative. Justice Thomas's concurrence, joined by Justice Gorsuch, argued that "an officer must be properly appointed before he can legally act as an officer" and that actions taken by improperly appointed officers are void. *Id.* at 266 (Thomas, J., concurring).

These decisions confirm what Justice Scalia recognized in his *Morrison* dissent: Prosecutorial power "has always and everywhere ... been conducted never by the legislature, never by the courts, and always by the executive." 487 U.S. at 706 (Scalia, J., dissenting).

## D. The Removal Power Problem

As the government notes, the President retains power to remove even a judicially appointed interim U.S. Attorney. *See* 28 U.S.C. § 541(c); Gov't Br. 27. But this only highlights the constitutional tension.

Under the district court's reading, after 120 days the President may remove a court-appointed U.S. Attorney but may not appoint a replacement. Only the district court can fill the resulting vacancy. This

8

creates the possibility of a standoff: The court appoints someone unacceptable to the President; the President removes that person; the court appoints again; and the cycle continues. Such interbranch conflict is precisely what constitutional interpretation should avoid. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). The government's reading avoids this problem entirely.

## II. THE ORIGINAL MEANING OF THE EXCEPTING CLAUSE RAISES SERIOUS CONSTITUTIONAL DOUBT.

The Appointments Clause provides that Congress may "by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The district court assumed without analysis that this provision authorizes judicial appointment of prosecutors. That assumption deserves scrutiny.

### A. The Founding-Era Understanding

The phrase "Courts of Law" in the Excepting Clause was not an all-encompassing grant of appointment authority. It was a practical recognition that courts need control over their own ministerial officers.

During the Constitutional Convention, discussions of the Excepting Clause focused on appointments that would otherwise

burden the President and Senate with trivial matters. The Clause was added on September 15, 1787, just two days before the Convention concluded, as a measure of "convenience." 2 Records of the Federal Convention of 1787, at 627-28 (Max Farrand ed., 1911). The concern was administrative efficiency, not restructuring the relationship between the branches.

Early congressional practice confirms this understanding. The First Congress authorized courts to appoint their clerks. Act of Sept. 24, 1789, ch. 20, § 7, 1 Stat. 73, 76. Congress later extended judicial appointment authority to a small category of similar positions: bankruptcy commissioners, certain court reporters, and law clerks. *See Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 257-58 (1839) (discussing court appointment of clerks). All share a common feature: They are positions **ancillary to the judicial function**.

Prosecutors are categorically different. The power to prosecute is an executive power, among the most important executive powers. Prosecutors do not assist courts in adjudicating cases; they initiate cases and make discretionary enforcement decisions that courts then review. The notion that courts should select the officers whose charging

decisions courts will evaluate creates tensions with judicial impartiality. *See Freytag v. Commissioner,* 501 U.S. 868, 878 (1991) ("[The Appointments Clause] preserves … the Constitution's structural integrity by preventing the diffusion of the appointment power").

**B. Historical Practice Confirms Executive Appointment of Prosecutors.**

There is no evidence that anyone at the Founding contemplated judicial appointment of federal prosecutors. The first federal prosecutors were appointed by the President with Senate confirmation. Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92-93. This remained the exclusive method for seventy-five years.

The first statutory authorization for judicial appointment of interim U.S. Attorneys did not come until 1863, well outside the Founding era and in the midst of the Civil War, when normal constitutional processes were strained. Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768, 768. Even then, the statute was understood as an emergency measure, not a fundamental restructuring of appointment authority.

This history matters."[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional

11

provisions." *The Pocket Veto Case*, 279 U.S. 655, 689 (1929). The unbroken practice from 1789 to 1863 was executive appointment of prosecutors.

## C. These Concerns Create Constitutional Doubt.

Amicus does not ask this Court to hold Section 546(d) unconstitutional. The question is not squarely presented. But amici ask the Court to recognize that these concerns create serious constitutional doubt sufficient to trigger the constitutional avoidance rule.

The district court's reading maximizes constitutional tension. It interprets Section 546(d) not merely to authorize judicial appointment as a backstop, but to permanently displace executive appointment authority. The government's reading minimizes constitutional friction. A faithful application of the constitutional avoidance rule requires adopting the latter.

## III. THE CONSTITUTIONAL AVOIDANCE RULE REQUIRES THE GOVERNMENT'S READING.

The government's opening brief demonstrates that Section 546 is, at minimum, ambiguous. The text, structure, and history all support reading Sections 546(a) and 546(d) as conferring parallel appointment authority. *See* Gov't Br. 16-36. Amicus will not repeat that

comprehensive analysis. Instead, amicus emphasizes that given the constitutional concerns outlined above, the constitutional avoidance rule requires adopting the government's reading.

A. **The Avoidance Rule Applies.**

The constitutional avoidance rule provides that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Harris v. United States*, 536 U.S. 545, 555 (2002) (plurality opinion). *See also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 426 (2012).

The rule "is not a license for the judiciary to rewrite language enacted by the legislature," but where "two plausible statutory constructions" exist, it requires courts to "adopt the reading that avoids constitutional doubt." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

The avoidance rule reflects the judiciary's obligation to construe statutes, where fairly possible, to avoid conflicts with the Constitution. "When a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended

that result." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).

Here, both conditions are satisfied. First, Section 546 is susceptible of two plausible readings. Second, the district court's reading raises grave constitutional questions: It permanently transfers authority over a core executive function from the Executive Branch to Article III courts.

**B. The Government's Reading Avoids Constitutional Difficulties**.

The government's reading treats Sections 546(a) and 546(d) as conferring parallel authority after the initial 120-day period expires. Either the Attorney General or the district court may fill a vacancy, with the Executive's choice prevailing by virtue of the President's removal power.

This interpretation preserves constitutional harmony. The Executive Branch retains meaningful control over who exercises prosecutorial power. Courts retain authority to appoint as a backstop. And conflicts are resolved through the President's constitutionally grounded removal authority.

14

The district court's reading maximizes constitutional tension. It interprets Section 546 to permanently oust executive appointment authority, vesting exclusive control over prosecutor selection in the judiciary. Even if ultimately constitutional, serious doubt is sufficient to trigger the avoidance rule. The Court should adopt the government's reading and reverse.

## CONCLUSION

The district court's decision reflects a careful engagement with the statutory text but ultimately adopts an interpretation that cannot be reconciled with the Constitution's structure. The Executive Branch's authority over prosecution is not a mere administrative detail; it is a fundamental feature of the separation of powers. Section 546 should be interpreted to preserve that authority, not to transfer it permanently to the judiciary.

The Court should reverse and hold that the Attorney General retains authority to make successive interim appointments under Section 546(a), with district courts' Section 546(d) authority serving as a permissive supplement rather than an exclusive substitute.

Respectfully submitted,

*/s/ Theodore M. Cooperstein*
Theodore M. Cooperstein
THEODORE COOPERSTEIN PLLC
1888 Main Street, Suite C-203
Madison, MS 39110
(601) 397-2471
ted@appealslawyer.us

**Counsel for Amicus Curiae
Unify.US**

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), 32(a)(7)(B) because it contains 2,583 words, not including items excluded in accordance with Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced typeface using Apple Pages in Century Schoolbook 14-point font in text and Century Schoolbook 14-point font in footnotes.

Dated: February 16, 2026

/s/ Theodore M. Cooperstein
THEODORE M. COOPERSTEIN